UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 09/19/2022

-------------------------------------------------------------------- X

MIRZO ATADZHANOV,                                    :

              Plaintiff,                :          21-cv-5098 (LJL)

        -v-                                         :

CITY OF NEW YORK, et al.,                            :          OPINION AND ORDER

            Defendants.               :

-------------------------------------------------------------------- X

LEWIS J. LIMAN, United States District Judge:

      Plaintiff Mirzo Atadzhanov ("Plaintiff") brings this action, *pro se*, pursuant to 42 U.S.C.

§ 1983 against the City of New York (the "City") and eight officers[1] ("Individual Defendants,"

and with the City, "Defendants") of the New York City Department of Correction ("DOC"),

alleging that his constitutional rights were violated because he was periodically not given food

conforming to his medically-prescribed diet. Dkt. No. 25. Defendants move to dismiss the

amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), arguing that: (1)

Plaintiff fails to meet the requirements to state a claim of unconstitutional conditions of

confinement; (2) he fails to allege the personal involvement of the Individual Defendants; (3) he

fails to allege facts sufficient to support a claim of municipal liability; and (4) he fails to state a

claim for denial of due process based on inadequate prison grievance procedure. Dkt. No. 35.

---

[1] The eight officers of the New York Department of Correction are Marc Johnson, Tyler Mason,
Dixon O'Neill, Eleazar Paz, Ralph Celestin, Robert Lee, Desiree Ruiz, and Raymond Simmons.
Dkt. No. 25 at 2.

For the following reasons, the Court grants the motion to dismiss as to Plaintiff's claims of municipal liability and due process based on the prison grievance procedure but denies the motion as to his claim of unconstitutional conditions of confinement.

## BACKGROUND

The Court liberally construes Atadzhanov's factual allegations in his amended complaint and accepts the pleaded allegations as true for purposes of this motion.  *See Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) ("It is well established that the submissions of a *pro se* litigant must be construed liberally and interpreted to raise the strongest arguments that they suggest." (internal quotation marks and emphasis omitted)).  In addition, the Court considers Atadzhanov's factual allegations in his opposition brief and surreply "to the extent that they are consistent with the complaint, treating the new factual allegations as amending the original complaint."  *Davila v. Lang*, 343 F. Supp. 3d 254, 267 (S.D.N.Y. 2018); *see also Walker v. Schult*, 717 F.3d 119, 122 (2d Cir. 2013) ("A district court deciding a motion to dismiss may consider factual allegations made by a *pro se* party in his papers opposing the motion."); *Tracy v. Freshwater*, 623 F.3d 90, 101 (2d Cir. 2010) ("The solicitude afforded to *pro se* litigants . . . . most often consists of liberal construction of pleadings, motion papers, and appellate briefs."); *Howell v. 1199 Union*, 2015 WL 273655, at *3 (S.D.N.Y. Jan. 16, 2015) ("[T]he Court considers the factual allegations in [*pro se*] Plaintiff's opposition papers—including his surreplies[ ]—to the extent that they are consistent with the complaint's allegations."), *aff'd sub nom. Howell v. Vazquez*, 643 F. App'x 60 (2d Cir. 2016).

Atadzhanov was a pretrial detainee in the custody of DOC at North Infirmary Command ("NIC") on Rikers Island.  Dkt. Nos. 2 at 4, 6, 25 at 10.[2]  Atadzhanov lacks molars and is unable

---

[2] All page number references to Atadzhanov's complaint, Dkt. No. 2, and his amended complaint, Dkt. No. 25, are to page numbers on the ECF filing and not the document itself.

to chew solid food.  Dkt. No. 25 at 10.  On March 25, 2021, a doctor prescribed him a puree diet

to accommodate his dental issues.  *Id.*  Atadzhanov alleges that "43 times" from March 2021 to

October 2021, he did not receive his pureed-diet food, *id.* at 10, including a three-day period

from March 27 to March 29, 2021 during which he did not receive four consecutive meals.  Dkt.

No. 2 at 6, 75, 87; Dkt. No. 25 at 12–14.

The Individual Defendants are correctional officers at NIC who worked on the dates that

Atadzhanov did not get his food.  Dkt. No. 25 at 10.  During the time period spanning the

allegations in his amended complaint, Atadzhanov lived in two different housing units at Rikers

Island.  Dkt. No. 52 at 6–7.  At his first housing unit, Mason was the main officer in charge of

breakfast, Johnson was the main officer in charge of lunch, and O'Neill was the main officer in

charge of dinner.  *Id.*  Lee would occasionally substitute for Johnson, and Simmons would

occasionally substitute for Mason.  *Id.* at 7.  He moved to the second housing unit in April 2021.

*Id.* at 6–7.  Celestin was responsible for lunch at Atadzhanov's second housing unit.[3]  Ruiz was

not posted at a specific housing unit but would receive food carts destined for the housing units

and would allegedly allow workers to steal items from the pantry.  *Id.*  Finally, Paz was in charge

of the mess hall, which provided the food to both housing units.  Dkt. Nos. 52 at 8, 60 at 6–7.

Of the numerous incidents described in the amended complaint, Atadzhanov states that

on 14 occasions he informed the Individual Defendants that he had not received his pureed diet.

Dkt. No. 25 at 12–16.  Atadzhanov further alleges that in each instance the officers ignored his

request for a meal.  *Id.*  For example, on March 27, 2021, Atadzhanov informed O'Neill that he

had not received his lunch or his dinner.  *Id.* at 12.  O'Neill stated "[I] will try to fix it," but never

---

[3] In Atadzhanov's opposition brief, he identifies additional officers "Hoyt and an unidentified white male" in charge of breakfast and dinner at his second housing unit, but he did not name them as defendants in either his complaint or his amended complaint.  *Id.* at 8.

went to the pantry to check or called the mess hall to see where Atadzhanov's food was.  *Id.* at
12–13.  The following day, March 28, 2021, when Atadzhanov was not delivered his breakfast,
he asked Simmons to check the pantry and to find his food; Simmons checked the pantry and
found nothing.  Then, in response to Atadzhanov's subsequent request that Simmons call the
mess hall, Simmons replied "it's useless" and never called.  *Id.* at 13.  That same day,
Atadzhanov also was not provided his lunch.  *Id.*  He told Johnson who, in response, offered him
the regular tray available to all detainees and stated "just take this, forget this special diet," *id.*,
and then did not check the pantry or call the mess hall, *id*.

That same day at dinner, Atadzhanov received apple sauce "polluted" with something
that resembled "spit or mold" and Johnson refused to investigate.  *Id.* at 14.  On March 29, 2021,
Atadzhanov did not receive his breakfast; Simmons refused to call the mess hall.  *Id.*  Two days
later, on March 31, 2021, Atadzhanov did not receive breakfast while Simmons was on duty.  *Id.*
Also on March 31, 2021, Atadzhanov did not receive his dinner and O'Neill refused to call the
mess hall.  *Id.* at 14.  The following morning, April 1, 2021, when Atadzhanov did not get his
breakfast, Mason called the mess hall but no one answered the phone; although Mason promised
to call later, he never did.  *Id.*

Atadzhanov's amended complaint also alleges that he did not receive the following
meals: breakfast on April 4, 2021 with Mason on duty, *id*. at 14, dinner on April 5, 2021 with
O'Neill on duty, *id*. at 15, lunch on April 6, 2021 with Lee on duty, *id*., breakfast on April 23,

2021 with Mason on duty,[4] *id.*, and lunch on April 25, 2021 with Ruiz on temporary duty, *id.*[5]
Atadzhanov alleges that O'Neill did not check the pantry to find Atadzhanov's food.  *Id.*  He also
alleges that in none of the other instances did the officers call the mess hall to check on
Atadzhanov's meal.  *Id.* at 14–15.

On May 8, 2021, Atadzhanov did not receive his breakfast.  *Id.* at 15.  Celestin did not
check the pantry to find his food.  *Id.* at 16.  Atadzhanov then asked him to call the mess hall.  *Id.*
When Celestin reached Paz at the mess hall, Paz told Celestin that the mess hall did not receive
Atadzhanov's food from the facility that prepares the food prior to its transfer to NIC.  *Id.*  Later,
Atadzhanov encountered Paz and asked him if he called the preparation facility, and Paz said he
had not done so.  *Id.*  Although this is the only instance in which he describes a specific
interaction with Paz, Atadzhanov generally alleges in his opposition brief that "[a]lmost every
single day when got [sic] issue with my food, I used to notify officers of the housing-unit.  They
in turn 'sometimes' called the officer Paz in order to get my food.  Almost every single day my
food wasn't delivered to the unit."  Dkt. No. 52 at 3.

In all, based on his complaints and grievance forms, Atadzhanov was denied food for
seventeen meals, was missing food for three meals, and received food that was contaminated or
"old" eleven times from March 27, 2021 through May 8, 2021.[6]  Eleven of those instances—nine

---

[4] This appears to contradict Atadzhanov's statement that he changed housing units on April 15,
2021, which had different officers on duty for breakfast.  Atadzhanov, however, describes Mason
as "mostly" in charge of breakfast.  Dkt. No. 52 at 6–7.  Because the Court only considers facts
alleged in an opposition brief to the extent that they do not contradict the amended complaint, the
Court relies on the amended complaint and assumes that Atadzhanov transferred units sometime
in April.  *Davila*, 343 F. Supp. 3d at 267.  Atadzhanov's grievance forms also indicate that he
may have transferred in early April.  *See*, *e.g.*, Dkt. No. 2 at 110 (providing that he was at "6
South" on April 4).
[5] Atadzhanov also did not receive breakfast on April 26, 2021.  He does not, however, identify
the officer on duty on that date.  Dkt. No. 25 at 17.
[6] These include additional dates included on the grievance forms that Atadzhanov included with

of which he received no meals, one of which was a partial meal,[7] and the last of which the meal appeared to be covered in "spit or mold"—occurred during a one-week period from March 27 to April 2.  Dkt. No. 2 at 11–111; Dkt. No. 25 at 11–15.

Atadzhanov complained by calling the "311" grievance number and asking the operator to send the complaints to City Hall on numerous occasions but "things didn't change."  Dkt. No. 25 at 16; Dkt. No 52 at 8–9.  Atadzhanov also filed numerous grievances and appeals to various entities within the DOC.  *See generally* Dkt. No. 2 at 11–114.  In his opposition brief, Atadzhanov alleges that "violations" occurred after October 2021 following the filing of his amended complaint including "through 2022 year almost daily."  Dkt. No. 52 at 5.  Atadzhanov states he "wasn't able to get [his] food almost every single day" from October 2021 to March 2022.  *Id.*  He also alleges that when officers receive food carts, they also receive a list of a special-diet menu.  *Id*. at 5.

As a result of his food deprivation, Atadzhanov has suffered significant weight loss.  On March 8, 2021—the date of his arrest—he weighed 200 pounds.  Dkt. No. 25 at 11–12.  As of the filing of his amended complaint in November 2021, he had lost 40 pounds.  *Id.* at 12.

## PROCEDURAL HISTORY

Plaintiff filed his complaint on June 7, 2021.  Dkt. No. 2.  By order of July 6, 2021, the Court dismissed Plaintiff's claims against DOC and directed service on the City.  Dkt. No. 6.  The Court issued an order on August 9, 2021, staying discovery in anticipation of the resolution

---

his original complaint and referenced in his amended complaint.  Dkt. No. 25 at 19.  Those forms do not identify specific officers.  *Id*.  Atadzhanov also alleges additional instances of inadequate food from May 8, 2021 through October 12, 2021.  While he does not specifically indicate the officer on duty during those times, he describes the officers "in charge" on those dates—two of which were not named in the Complaint.  *See supra* note 3.

[7] It is unclear, from the grievance, which meal this was on that date.  *See* Dkt. No. 2 at 91.  Viewing the facts in the light most favorable to Atadzhanov, the Court treats this grievance as a separate partial meal.

of Defendants' intended motion to dismiss.  Dkt. No. 16.  On November 2, 2021, Plaintiff filed

an amended complaint.  Dkt. No. 25.

Defendants filed this motion to dismiss on January 31, 2022, along with a memorandum

of law in support of the motion.  Dkt. Nos. 33, 35.  On July 11, 2022, Plaintiff filed his

memorandum of law in opposition to the motion.  Dkt. No. 52.  On July 25, 2022, Defendants

filed a reply memorandum of law in further support of the motion to dismiss.  Dkt. No. 53.

Plaintiff filed a surreply on September 13, 2022.  Dkt. No. 60.

## LEGAL STANDARDS

In reviewing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the

Court "accept[s] all factual allegations as true, and draw[s] all reasonable inferences in the

plaintiff's favor."  *Austin v. Town of Farmington*, 826 F.3d 622, 625 (2d Cir. 2016).  This

requirement "is inapplicable to legal conclusions."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

"Threadbare recitals of the elements of a cause of action, supported by mere conclusory

statements, do not suffice."  *Id*.  A complaint must offer more than "labels and conclusions," or

"a formulaic recitation of the elements of a cause of action" or "naked assertion[s]" devoid of

"further factual enhancement" in order to survive dismissal.  *Bell Atlantic Corp. v. Twombly*, 550

U.S. 544, 555, 557 (2007).  The ultimate question is whether "[a] claim has facial plausibility,

[*i.e.*,] the plaintiff pleads factual content that allows the court to draw the reasonable inference

that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.  "Determining

whether a complaint states a plausible claim for relief will . . . be a context-specific task that

requires the reviewing court to draw on its judicial experience and common sense."  *Id*. at 679.

Put another way, the plausibility requirement "calls for enough fact to raise a reasonable

expectation that discovery will reveal evidence [supporting the claim]."  *Twombly*, 550 U.S. at

556; *see also Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 46 (2011) (same).

While the law mandates dismissal for a failure to state a claim on which relief may be granted, the Court is obliged to construe *pro se* pleadings liberally, *see Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009), and interpret them to raise the "strongest [claims] that they suggest," *Triestman*, 470 F.3d at 474–75 (internal quotation marks and emphasis omitted).

## DISCUSSION

Defendants move to dismiss on several grounds: (1) the complaint fails to meet the objective and subjective prongs to state a claim of unconstitutional conditions of confinement; (2) Plaintiff fails to allege the personal involvement of the Individual Defendants; (3) Plaintiff fails to allege a basis for *Monell* liability against the City; and (4) to the extent that Plaintiff alleges his complaints were disregarded, he fails to state a claim for denial of due process.  Dkt. No. 35 at 1, 5, 13, 16, 19.  The Court takes the arguments in turn.

## I.      Plaintiff's Claim of Unconstitutional Conditions of Confinement

A pretrial detainee has "not been convicted of a crime and thus 'may not be punished in any manner—neither cruelly and unusually nor otherwise.'"  *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017) (quoting *Iqbal v. Hasty*, 490 F.3d 143, 168 (2d Cir. 2007)).  A pretrial detainee's complaint about the conditions of his confinement is appropriately judged under the standards of the Due Process Clause of the Fourteenth Amendment rather than the standards of the Cruel and Unusual Punishments Clause of the Eighth Amendment.  *Id.*  The "pretrial detainee must satisfy two prongs to prove a claim: an 'objective prong' showing that the challenged conditions were sufficiently serious to constitute objective deprivations of the right to due process, and a 'subjective prong'—perhaps better classified as a '*mens rea* prong' or 'mental element prong'— showing that the officer acted with at least deliberate indifference to the challenged conditions." *Darnell*, 849 F.3d at 29.

The first prong is satisfied by allegations of conditions that "either alone or in combination, pose an unreasonable risk of serious damage to [the detainee's] health." *Id*. at 30 (quoting *Walker*, 717 F.3d at 125). The deprivation of nutrition or the service of contaminated food can be one of those conditions. "In order to determine whether an alleged deprivation was objectively serious, the Court must inquire (1) whether the prison officials acted reasonably in response to the inmate's needs and (2) what harm, if any, the inadequacy in the officials' response to the inmate's need has caused or will likely cause the inmate." *Gaines v. Armor Health Care, Inc.*, 2012 WL 5438931, at *4 (E.D.N.Y. Nov. 2, 2012) (citing *Salahuddin v. Goord*, 467 F.3d 263, 279–80 (2d Cir. 2006)). Pretrial detainees, in the custody of the State, are entitled to "be served 'nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it.'" *Robles v. Coughlin*, 725 F.2d 12, 15 (2d Cir. 1983) (quoting *Ramos v. Lamm,* 639 F.2d 559, 571 (10th Cir. 1980), *cert. denied,* 450 U.S. 1041 (1981)) (sustaining complaint alleging that prisoners were denied food on 12 days within a 53-day period, three of which were consecutive); *see also Willey v. Kirkpatrick*, 801 F.3d 51, 69 (2d Cir. 2015) (prisoner's complaint that he was served nothing more than stale bread and rotten cabbage for one week stated claim for relief); *Jabbar v. Fischer*, 683 F.3d 54, 57 (2d Cir. 2012) ("[P]risoners may not be deprived of their basic human needs – *e.g.*, food, clothing, shelter, medical care, and reasonable safety – and they may not be exposed to conditions that pose an unreasonable risk of serious damage to [their] future health."). In addition, "[c]ourts have held that '[a]llegations that a prisoner was served food contaminated or "tainted" by foreign objects, e.g. . . . human waste . . . , are sufficient to plead a constitutional violation.'" *Ballard v. Lane*, 2019 WL 1129158, at *2

(S.D.N.Y. Mar. 12, 2019) (Nathan, J.) (quoting *Reid v. Nassau Cnty. Sheriff's Dept.*, 2014 WL 4185195, at *46 (E.D.N.Y. Aug. 20, 2014) and citing cases).

"[T]here is no 'static' definition of a deprivation" or any "bright-line durational or severity limits in conditions of confinement cases." *Darnell*, 849 F.3d at 31. "[T]he conditions themselves must be evaluated in light of contemporary standards of decency." *Id.* at 30 (quoting *Blissett v. Coughlin*, 66 F.3d 531, 537 (2d Cir. 1995)). Nor must a plaintiff plead that he actually suffered a serious injury; the defendant is not entitled to a free pass until the risk of serious damage to the detainee's health materializes into actual grave damage. *See Darnell*, 849 F.3d at 31 (noting that the court "has never imposed a requirement that pretrial detainees show that they actually suffered from serious injuries"). Nonetheless, "courts impose a high bar to success on a conditions of confinement claim based on a theory that the food provided in a prison or jail was inadequate." *Rombousek v. Trinity Co.*, 2022 WL 2343236, at *4 (S.D.N.Y. June 29, 2022). "Allegations that the food served is 'unpleasant' do not state a constitutional claim." *Monroe v. Cnty. of Rockland*, 2022 WL 2441118, at *2 (S.D.N.Y. July 5, 2022). Repeated instances of spoiled food are sufficient to state a claim. *See, e.g.*, *Lunney v. Brureton*, 2005 WL 121720, at *6 (S.D.N.Y. Jan. 21, 2005) (holding that a plaintiff's allegations that his meals were "regularly spoiled" on "numerous occasions" were "sufficient to state an Eighth Amendment claim").

Plaintiff alleges two types of inadequate conditions relating to his food: that he received partial or contaminated/old food at some mealtimes, and that he received no food at all for other mealtimes. *See generally* Dkt. No. 25 at 13–14. To establish a "food tampering" claim, a plaintiff "must allege that he suffered an actual injury." *Calvin v. Schmitt*, 2017 WL 4280683, at *5 (S.D.N.Y. July 7, 2017) (concluding that plaintiff failed to establish a connection between defendants and allegations of food tampering). "[T]he mere allegation of food tampering alone

[] is insufficient to establish a claim under the Eighth Amendment." *Constant v. Prack*, 2019 WL 3287818, at *38 (S.D.N.Y. July 19, 2019) (citation omitted).  Allegations of weight loss uncoupled with other symptoms of illness do not necessarily establish a food tampering claim. *See, e.g.*, *Pagan v. Westchester Cnty.*, 2014 WL 982876, at *36 (S.D.N.Y. Mar. 12, 2014) (finding that descriptions of undercooked and rotten food, "alongside the alleged resulting injuries of, *inter alia*, severe stomach pain, nausea, vomiting, diarrhea, weight loss, and headaches are sufficient to state a claim of a serious deprivation"); *Buffaloe v. Fein*, 2013 WL 5815371, at *36 (S.D.N.Y. Oct. 24, 2013) ("[Plaintiff's] claims regarding his limited weight loss fail, as a matter of law, to rise to the level of a serious medical condition." (citations omitted)); *Houston v. Schriro*, 2013 WL 4457375, at *7 (S.D.N.Y. Aug. 20, 2013) (finding that "[t]he denial of a medically-prescribed diet may constitute an Eighth Amendment violation if that denial results in a sufficiently serious medical condition"); *Brureton*, 2005 WL 121720, at *6 (holding that allegations of regularly spoiled meals served on numerous occasions, leading to sickness when consumed or malnutrition when refused, coupled with allegations that led to an inference of knowledge by the prison officials, were sufficient to state an Eighth Amendment claim).

Allegations that a prisoner has received *no* food for a prolonged period, however, do not fail to satisfy the objective prong of a conditions of confinement claim as a matter of law.  *See Hodge v. Ruperto*, 739 F. Supp. 873, 876 (S.D.N.Y. 1990) (denying defendants' motion to dismiss when plaintiff alleged he was not provided food or water for two and a half days); *Moss v. Ward*, 450 F. Supp. 591, 594, 597 (W.D.N.Y. 1978) (holding that depriving a prisoner of food for four consecutive days violated plaintiff's Eighth Amendment rights).  *But see Amberslie v. Prisoner Transp. Serv. of America, LLC*, 2019 WL 1024183, at *12 (N.D.N.Y. Mar. 4, 2019)

(dismissing "broad allegations regarding the deprivation of food, bathroom breaks, and unreasonable safety, over a relatively brief, finite period [of days during transportation between Georgia to New York]").  Nor must a plaintiff allege an actual injury to state a claim when food is not provided at all.  *See, e.g.*, *Beckford v. Portuondo*, 151 F. Supp. 2d 204, 213 (N.D.N.Y. 2001) ("When a prison guard deprives a prisoner of two of the regularly three meals served each day, the objective prong of the Eighth Amendment may be met if the defendants do not satisfy their burden of showing that the one meal served is nutritionally adequate.").  A condition is serious for constitutional purposes if it "pose[s] an unreasonable risk of serious damage to [the plaintiff's] health . . . which includes the risk of serious damage to physical and mental soundness."  *Darnell*, 849 F.3d at 30 (internal quotation marks and citations omitted); *see*, *e.g.*, *Rush v. Fisher*, 923 F. Supp. 2d 545, 555 (S.D.N.Y. 2013) (noting that the Eighth Amendment may be violated when there is a "continued failure to provide a diabetic inmate with a medically appropriate diet, resulting in a decline in his health").

Defendants argue that the complaint should be dismissed because the allegations do not show that he faced an "immediate danger to [his] health and well-being," Dkt. No. 53 at 3 (quoting *Robles*, 725 F.2d at 15), or that he suffered any adverse health consequences or demonstrable physical injury as a result of the food deprivation, *id.* at 4.  They argue that weight loss—even the loss of nearly one-quarter of Plaintiff's body weight—alone does not constitute an adverse health consequence.

A serious injury need not have manifested itself.  The question is whether the conditions fell so far short of standards that they "pose[d] an unreasonable risk of serious damage to [his] health."  *Roundtree v. City of N. Y.*, 2018 WL 1586473, at *2 (S.D.N.Y. Mar. 27, 2018).  To be sure, a conclusory allegation that the Plaintiff lost a "significant amount of weight"—or even that

he lost 15 pounds in one month and 26 pounds in two months—may not by itself show that those conditions posed an unreasonable risk of serious damage to the plaintiff's health when defendants took action to address the deficiencies. *See, e.g.*, *Constant v. Prack*, 2019 WL 3287818, at *3, 15 (S.D.N.Y. July 19, 2019) (finding that weight loss alone was insufficient "particularly where Defendants appeared to take actions to improve [food] services to SHU residents" (internal quotation marks omitted)); *Bost v. Bockelmann*, 2007 WL 527320, at *8 (N.D.N.Y. Feb. 20, 2007) (finding on summary judgment that fifteen pounds lost in three days did not pose a condition of urgency when defendants prescribed "health shakes" and a "thirty day high protein diet"). But Plaintiff alleges that Defendants took no remedial action and that the deficiencies continued to occur after his filing of the amended complaint. Dkt. No. 52 at 5.

Moreover, the assertion that weight loss alone cannot support a claim that Plaintiff's health was in serious danger is plainly overbroad. The absolute number of pounds a detainee may have lost may not itself say much about the impact of that loss on the defendant's health, but the number of pounds the detainee has lost relative to the detainee's pre-existing weight and the speed with which the weight has been lost absolutely can speak to the impact on the detainee's health. *See Anderson v. Kooi*, 2011 WL 1315721, at *12 (N.D.N.Y. Jan. 24, 2011), *report and recommendation adopted*, 2011 WL 1256942 (N.D.N.Y. Apr. 1, 2011) ("While weight loss alone may not constitute a serious medical condition, rapid weight loss or weight loss coupled with other conditions may present a serious medical condition."). The allegation that Plaintiff lost nearly one-quarter of his body weight over a seven-month period, that during a particular 48 hour period he received no meals with the singular exception of a meal contaminated by "spit or mold," and that he was "starving" due to the lost meals and would "starve harsher" if he was not fortuitous enough to be able to purchase food from the commissary

shop, Dkt. No. 2 at 6, 113, is sufficient at this stage to state a constitutional claim. *See Dearman v. Woodson*, 429 F.2d 1288, 1290 (10th Cir. 1970) (stating that it could not conclude, as a matter of law, that 50 and 1/2 hours of starvation was not "cruel and unusual punishment"); *Hill v. Cnty. of Montgomery*, 2019 WL 5842822, at *13 (N.D.N.Y. Nov. 7, 2019) (complaint that plaintiffs' food portions were halved three to four times a week, that other food was watered down or of such poor quality to be inedible, and that they had to resort to non-prison meal consumption stated claim for relief); *Watson v. Wright*, 2013 WL 1791079, at *6 (W.D.N.Y. Mar. 26, 2013), *report and recommendation adopted*, 2013 WL 1789578 (W.D.N.Y. Apr. 26, 2013) (concluding that "a triable issue of fact exists as to whether plaintiff's weight loss—especially when coupled with plaintiff's Hepatitis C—constitutes a sufficiently serious condition under the objective prong"); *Bourgoin v. Weir*, 2011 WL 4435695, at *7 (D. Conn. Sept. 23, 2011) (finding that "significant weight loss—more than forty pounds [over approximately 11 months]—may be objective evidence of a deterioration in the state of Mr. Bourgoin's health"); *Anderson*, 2011 WL 1315721, at *13 (denying summary judgment "to the extent that the Amended Complaint alleges deliberate indifference based on rapid weight loss and the failure to provide nutritional supplements" when there was no treatment and it was unclear "whether this weight loss occurred rapidly").

Construing the *pro se* Plaintiff's allegations liberally, as the Court must at this stage, they state a claim under the Due Process Clause of the Fourteenth Amendment for food denial. Plaintiff has stated that he lacked food adequate for his diet during substantial periods of time, including a two-day period.  Dkt. No. 25 at 11; *see Hill*, 2019 WL 5842822, at *13; *Salgado v. DuBois*, 2019 WL 1409808, at *10 (S.D.N.Y. Mar. 28, 2019) (allegations that plaintiff was served inadequately small-portioned and unsanitary meals which included rotting and insect-

infested food stated a claim for relief).  This is not a case where Plaintiff complains about the lack of variety of food or that he was denied his preference for a specific type of food.  *Cf. Monroe*, 2022 WL 2441118, at *3.  There were medical requirements for Plaintiff's precise diet because he was physically unable to chew solid food.  Dkt. No. 25 at 10; *see Word v. Croce*, 169 F. Supp. 2d 219, 226 (S.D.N.Y. 2001) (finding "[p]risons have an affirmative duty to provide their inmates with nutritionally adequate food" such that a prisoner has a right to a specialized diet while incarcerated due to medically peculiar circumstances).

The second prong requires well-pleaded allegations "that the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety."  *Darnell*, 849 F.3d at 35; *see also Kingsley v. Hendrickson*, 576 U.S. 389, 396 (2015) (holding that courts must use an objective standard when considering a defendant's state of mind in an excessive force claim brought under the Fourteenth Amendment by a pretrial detainee).  "[T]he 'subjective prong' (or '*mens rea* prong') of a deliberate indifference claim is defined objectively."  *Darnell*, 849 F.3d at 35.  "Mere negligence or inadvertent failure to provide a medically necessary diet is not a constitutional violation."  *Abdush-Shahid v. Coughlin*, 933 F. Supp. 168, 180 (N.D.N.Y. 1996).

"[I]n order to establish a defendant's individual liability in a suit brought under Section 1983, a plaintiff must show . . . the defendant's personal involvement in the alleged constitutional deprivation."  *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013).  Plaintiff adequately alleges personal involvement with respect to each of the Individual Defendants.  In each case, Plaintiff alleges that a defendant corrections officer either did not

provide Plaintiff with his required pureed food or (in the case of Defendant Paz) did not contact the facility responsible for preparing Plaintiff's food. *See* Dkt. Nos. 25 at 13–16, 52 at 3–5.

As discussed further below, Plaintiff also has stated that certain of the Defendants had a sufficiently culpable state of mind. Construing the *pro se* pleading in favor of the Plaintiff, he made each of the Individual Defendants aware of his diet and of his need to be served pureed food in order to ingest it and the Individual Defendants ignored those requirements and his requests. *See generally* Dkt. No. 25. At this stage, Plaintiff has pleaded enough to show that Defendants recklessly failed to act with reasonable care to mitigate the risk that the condition posed to him under circumstances in which they at least should have known that the conditions posed an excessive risk to his health or safety. *See Salgado*, 2019 WL 1409808, at *11.

Defendants also argue that the complaint does not state a claim for relief because it alleges that on certain occasions an Individual Defendant would attempt to call or check the mess hall or pantry for Plaintiff's food or would offer him a regular food tray to ensure he received some nutrition. Dkt. No. 53 at 5. But that argument fails to take the allegations of the complaint as true and to read them liberally in favor of Plaintiff. From the facts alleged, efforts made could be viewed as superficial and calls as duplicitous. Defendants' real intent was revealed in their follow up comments when they said that they would not help Plaintiff, Dkt. No. 25 at 12–13, and sustained denial of ingestible food over time. Defendants' argument that Plaintiff on occasion was offered the regular meal tray misses the point. Taking the allegations of the complaint as true, Plaintiff was on a puree diet because he could not chew solid food. Dkt. No. 25 at 10 ("On 3/25/2021, a doctor prescribed me a puree-diet. I don't have molars and unable to chew solid-food."). The argument that Plaintiff was offered hard food in lieu of the soft pureed food is thus akin to the claim that it would be sufficient for Defendant to satisfy its constitutional obligations

to put a plate of pork in front of starving detainee whose religious scruples prevented him from eating pork. *Cf. Abreu v. Farley*, 2019 WL 1230778, at \*25 (W.D.N.Y. Mar. 15, 2019) ("[P]rison officials must provide a prisoner a diet that is consistent with his religious scruples." (quoting *Bass v. Coughlin*, 976 F.2d 98, 99 (2d Cir. 1992))).  The regular meal tray might have had nutritional value but—taking the amended complaint's allegations as true—not nutritional value of which Plaintiff could physically partake.

Defendants argue that the amended complaint does not sufficiently allege that the Individual Defendants meet the deliberate indifference standard because the amended complaint does not allege either that Defendants knew that Plaintiff required pureed food or that Plaintiff had not received his food multiple times due to the rotation of officers on shifts.  *See* Dkt. No. 35 at 12.  The argument that Defendants did not know Plaintiff's pureed diet was a medical requirement is unavailing.  Liberally construing Plaintiff's allegation that he told an officer "I didn't get my food" and the officer responded by saying he would "try to fix it" indicates that Plaintiff communicated and the officer knew that pureed food was required, not merely a preferential request.  Dkt. No. 25 at 12.  Plaintiff's additional allegations recounting similar conversations with Individual Defendants permit the inference that Defendants knew Plaintiff's diet was medically necessary.  Further, Plaintiff alleges in his opposition brief that when officers received meals for inmates, they "would also receive a list of special-diet menu."  Dkt. No. 25 at 15.  At the very least, Individual Defendants were aware that Plaintiff's diet requirements were officially recognized by their existence on that list.

Defendants' contention that no Individual Defendant knew the extent of Plaintiff's food deprivation is a closer case.  For example, Plaintiff alleges that Defendant Simmons did not provide his pureed breakfast on March 31, 2021, Defendant O'Neill did not provide his dinner

on the same day, and Defendant Mason did not provide his breakfast the next day on April 1. *See* Dkt. No. 25 at 14.  Defendants argue that, though Plaintiff received only one meal (albeit, covered in "spit or mold") over an approximately two-day period, each individual officer had no reason to know that Plaintiff had not received more than a single meal.  Thus, because deprivation of food for a single meal does not constitute a violation, Defendants argue that none of the Individual Defendants knew or should have known of the risk that Plaintiff faced deprivation of food sufficient to violate his rights.

Several facts militate in favor of a plausible inference that some of the Individual Defendants knew or should have known that Plaintiff frequently had not received food.  First, Plaintiff alleges that he lost forty pounds, or a fifth of his body weight, during a seven-month span. Dkt. No. 25 at 12.  In cases of ongoing cell conditions, courts have held that when defendants cause conditions to happen or the conditions are "easily noticeable," a liberal construal of a plaintiff's complaint states a claim under the Eighth Amendment.  *See, e.g.*, *McFadden v. North*, 827 F. App'x 20, 29 (2d Cir. 2020) (summary order) (holding that the subjective prong was met when defendants either caused or would have noticed prolonged unsanitary cell conditions); *Gaston v. Coughlin*, 249 F.3d 156, 165 (2d Cir. 2001) (holding that an allegation that defendants made "daily rounds" and were "directly responsible" for plaintiff's conditions was sufficient to deny a motion to dismiss).  While not as noticeable as debris, flooding, or other visibly unsanitary cell conditions, it is a reasonable inference that rapid weight loss would be easily noticeable by officers who consistently held the same meal shifts.

Second, Plaintiff filed numerous grievances detailing numerous instances of inadequate food.  *See generally* Dkt. No. 2 at 11–114.  These include fourteen additional allegations of expired food, partial food, or no food from April 2, 2021 to May 3, 2021 that were not

specifically associated with an interaction with a specific officer in the amended complaint. *Id*.

Plaintiff further alleged in his opposition brief that "[a]lmost every single day when got issue

[sic] with my food, I used to notify officers of the housing-unit." Dkt. No. 52 at 3.  He provided

a description of the roles and shifts that each officer played for each meal, stating that O'Neill,

Johnson, Mason, and Celestin were "in charge" and "mostly in charge" of certain meals. *Id*. at

6–8.  Taking the frequency of his notifications as true—which, for the purposes of this motion,

the Court must do—it is reasonable that the officers on duty at the time of those fourteen

allegations knew the extent of his food deprivation.

Third, in addition to his grievances, Plaintiff independently alleges in his amended

complaint multiple specific interactions between himself and O'Neill, Johnson, Mason,

Simmons, and Celestin, all which generally resulted in "fail[ure] to call the mess hall." Dkt. No.

25 at 12–16.  He alleges four such instances with O'Neill, two instances with Johnson (including

the "spit or mold" incident), three instances with Mason, and three instances with Simmons. *Id*.

at 10–15.  Such interactions occurred during a relatively short period of March 27 to April 6. *Id*.

Although he only specifically alleges one such conversation with Celestin, *id*. at 15, Celestin was

the main officer on duty during lunch at his second housing unit, Dkt. No. 52 at 7–8, and

Plaintiff filed several grievances concerning lunch at that housing unit, Dkt. No. 2 at 11–114.

Based on Plaintiff's allegations, it is also a reasonable inference that the Individual Defendants

understood the frequency of his inadequate food.

As for Paz, Plaintiff alleged that the officers, after he would "notify [the] officers of the

housing-unit" of his food deficiencies that "[t]hey in turn 'sometimes' called the officer Paz in

order to get my food." Dkt. No. 52 at 3.  Plaintiff further alleges that Paz was "in charge of our

mess hall," Dkt. No. 60 at 8, and that "it was the responsibility of the officer Paz to call the

R.N.D.C., food-sending facility to check my food delivery," Dkt. No. 52 at 3–4.  Although

Plaintiff alleges that while the officers, "almost every time," did not follow up with the mess

hall, *id*. at 5, he alleges that they "sometimes" did so, *id*. at 3.  He also specifically recalls in the

amended complaint one specific interaction in the which Celestin reached out to the mess hall to

check on Plaintiff's food with Paz.  Dkt. No. 25 at 16.  He later asked Paz about the delivery of

his food from R.N.D.C. and Paz confirmed that he did not follow up with R.N.D.C.  *Id*.

    Plaintiff, however, does not allege sufficient facts to permit a plausible inference that

Ruiz or Lee had sufficient knowledge of the full extent of Plaintiff's food deprivation.  Ruiz in

particular was not even posted at the housing unit, but at an "external post beyond the housing

unit," Dkt. No. 52 at 7, and even in the incident in which she was named, Plaintiff states that she

was "temporary substituting [sic] . . . Johnson," Dkt. No. 25 at 15.  Similarly, Lee was a

"substitute" at lunch, Dkt. No. 52 at 7, and he is only specifically mentioned once in the

amended complaint, Dkt. No. 25 at 15.  Plaintiff therefore does not allege sufficient facts to show

that Ruiz or Lee would have reason to know that Plaintiff did not receive adequate food.  The

Court thus dismisses the unconstitutional conditions of confinement claims against Ruiz and Lee.

    Taken together, Plaintiff's allegations permit the plausible inference that at least some of

the Individual Defendants should have known of the risk that Plaintiff was consistently being

deprived of food.  That the complaint could benefit from further amendment does not counteract

the plausible inference available from the facts already pleaded.  *Cf. Iverson v. Surber*, 2014 WL

12908065, at *6 (S.D.N.Y. Mar. 19, 2014) (holding that plaintiff's allegations that two officers

worked in tandem to withhold his mail based on actions taken during different shifts permitted a

plausible inference that they formed "at least an implicit agreement" (citing *Pangburn v.

Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999) (holding that further amendment is not necessary

even when a *pro se* plaintiff's complaint "could obviously benefit from further amendment" but still sufficiently makes out a claim as is))).

## II.      Plaintiff's Claim of Inadequate Grievance Process

Defendants also move to dismiss Plaintiff's claim of due process based on inadequate grievance procedure.  "Inmate grievance procedures are undertaken voluntarily and are not constitutionally required."  *Johnson v. New York City Dep't of Health*, 2008 WL 5378124, at *3 (S.D.N.Y. Dec. 22, 2008) (internal quotation marks and alterations omitted) (applying such law in the context of a pretrial detainee); *see also id*. ("[E]ven if Jenkins is correct that inmate medical complaints are knowingly excluded from the institutional grievance process at Rikers Island, that allegation does not state a constitutional claim.").  "A prisoner has no constitutional right to a prison grievance procedure or to have his grievances investigated."  *Hayes v. Cnty. of Sullivan*, 853 F. Supp. 2d 400, 434 (S.D.N.Y. 2012).  Because "[inmates do] not have a protected liberty interest in having his grievances investigated at the level of thoroughness that he desires, . . . he can not assert a due process claim as to such failures."  *Torres v. Mazzuca*, 246 F. Supp. 2d 334, 342 (S.D.N.Y. 2003).  Therefore, even if Rikers Island inadequately investigated Plaintiff's food complaints, Plaintiff's claim does not have merit.  The Court dismisses with prejudice Plaintiff's due process claim based on the adequacy of the grievance process at Rikers Island.

## III.     Plaintiff's *Monell* Claim Against the City

Finally, Defendants move to dismiss Plaintiff's *Monell* claim against the City.  The Defendants first argue that Plaintiff has failed to plead an underlying constitutional violation necessary to sustain his *Monell* claim.  Dkt. No. 35 at 17 (citing *Thomas v. Westchester Cnty.*, 2013 WL 3357171, at *6 (S.D.N.Y. July 3, 2013)).  In the alternative, Defendants argue that the *Monell* claim fails because Plaintiff "complains only about the alleged violation of his own

rights" and has not alleged "any description of a violative policy attributable to the City" or that the City's practice or custom was widespread.  *Id.* at 17–19.

Pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978), and its progeny, "a municipality can be held liable under Section 1983 if the deprivation of the plaintiff's rights under federal law is caused by a governmental custom, policy, or usage of the municipality."  *Jones v. Town of East Haven*, 691 F.3d 72, 80 (2d Cir. 2012).  "'[T]o prevail on a claim against a municipality under § 1983 based on acts of a public official, a plaintiff is required to prove: (1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury."  *Rivera v. Westchester Cnty.*, 488 F. Supp. 3d 70, 76 (S.D.N.Y. 2020) (quoting *Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008) (cleaned up)).  Liability therefore attaches if the violation resulted from a "government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." *Monell*, 436 U.S. at 694.

Plaintiff complies with the first element of a successful *Monell* claim of alleging actions by an official taken under color of law.  "[G]enerally, a public employee acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law."  *West v. Atkins*, 487 U.S. 42, 50 (1988).  Although "an official's 'on duty' status is not dispositive of exercising authority under the color of law," *Savarese v. City of N.Y.*, 547 F. Supp. 3d 305, 338 (S.D.N.Y. 2021), the Individual Defendants acted in their official capacity as state prison employees in serving Plaintiff meals.

With respect to the second element, the Court has determined that Plaintiff has sufficiently alleged a constitutional violation based on his conditions of confinement.  "'[A]

22

prerequisite to municipal liability under *Monell* is an underlying constitutional violation by a

state actor.'" *Moore v. City of N.Y.*, 2019 WL 2616195, at *8 (S.D.N.Y. Jun. 26, 2019) (quoting

*Dawkins v. Copeland*, 2019 WL 1437049, at *8 (S.D.N.Y.  Mar. 31, 2019)); *see City of Los*

*Angeles v. Heller*, 475 U.S. 796, 799 (1986) (finding that the municipality could not be liable

under § 1983 if a city employee inflicted no constitutional injury on the plaintiff); *Thomas*, 2013

WL 3357171, at *6 ("[A]bsent an underlying constitutional violation, a *Monell* claim cannot

lie.").

Plaintiff's *Monell* claim, however, does not properly allege the third element of

causation, in part because he does not sufficiently allege the fifth element, an official policy or

custom.  "[A] plaintiff must prove a causal link between an official municipal policy or custom

and a violation of his Constitutional rights." *Rodriguez v. City of N.Y.*, 2004 WL 444089, at *4

(S.D.N.Y. Mar. 10, 2004).  Municipal inaction alone is insufficient to show causation.  *Id.*

Instead, Plaintiff must allege an "affirmative" causal link between City "policy or custom" and

Defendants' failure to provide him with pureed food.  *Id.*

Plaintiff has not sufficiently alleged an official policy or custom for a valid *Monell* claim

against the City.  A plaintiff satisfies the "official policy or custom" requirement by alleging one

of the following: "(1) a formal policy officially endorsed by the municipality; (2) actions taken

by government officials responsible for establishing the municipal policies that caused the

particular deprivation in question; (3) a practice so consistent and widespread that, although not

expressly authorized, constitutes a custom or usage of which a supervising policy-maker must

have been aware; or (4) a failure by policymakers to provide adequate training or supervision to

subordinates to such an extent that it amounts to deliberate indifference to the rights of those who

come into contact with the municipal employees." *Rivera*, 488 F. Supp. 3d at 76–77 (quoting

*Brandon v. City of N.Y.*, 705 F. Supp. 2d 261, 276–77 (S.D.N.Y. 2010)); *see Patterson v. County of Oneida*, 375 F.3d 206, 226 (2d Cir. 2004) (describing methods of establishing *Monell* liability).

In his amended complaint, Plaintiff alleges the following:

> I called to "The 311" services several times and made complaints regarding that I didn't getting [sic] my food. I asked operators to send my complaint to "A City Hall" in order to get help from the Mayor's office. Despite that, things didn't change.  I constantly didn't getting [sic] my food.  Thus, The City of New York committed wrong as well.

Dkt. No. 25 at 16.  Plaintiff also documented the dates on which he sent complaints to "the City Hall" and provides confirmation numbers of those complaints.  *Id.* at 17.  Missing from Plaintiff's allegations against the City is the contention that the City—or its officers— has an official policy or custom of depriving prisoners of adequate nutrition.  As recounted above, Plaintiff properly alleges that on numerous occasions Individual Defendants failed to bring him pureed food.  He does not allege, however, that the prison or the City have a policy or custom of depriving prisoners generally of scheduled meals.

As for the first two means of meeting the "policy or custom" requirement, Plaintiff does not allege an "official policy" of depriving inmates of their meals or that government officials have established such an "official policy."  As for the third possible means of showing a "custom," Plaintiff "must prove that that the custom at issue is permanent and well-settled." *Ackridge v. Aramark Correctional Food Servs.*, 2018 WL 1626175, at *12 (S.D.N.Y. Mar. 30, 2019) (internal quotation marks and citation omitted).  That is, Plaintiff must prove that depriving detainees of food or serving inadequate meals is "common or prevalent throughout the [municipality]" and that it has achieved "permanent, or close to permanent, status."  *Davis v. City of N.Y.*, 228 F. Supp. 2d 327, 346 (S.D.N.Y. 2002).  Although Plaintiff alleges that he customarily was denied adequate meals, he has not alleged that the custom is widespread.

Plaintiff does not allege that other detainees have experienced a similar deprivation—nor does he identify any other detainees that require similar food accommodations—and generally his allegations support that other detainees received meals even while he did not.  Dkt. No. 25 at 13 (describing when he was offered a regular tray of food in lieu of pureed food).

Plaintiff also fails to allege *Monell* liability under a theory of failure to train.  "To state a *Monell* claim based on a failure to train, a plaintiff must 'allege a specific deficiency in the municipality's training.'"  *Moore v. Westchester Cnty.*, 2019 WL 3889859, at *4 (S.D.N.Y. Aug. 19, 2019) (quoting *Tieman v. City if Newburgh*, 2015 WL 1379652, at *22 (S.D.N.Y. Mar. 26, 2015)).  Plaintiff does not allege a specific deficiency in the City's training of its officers.

Plaintiff also does not sufficiently allege a failure to supervise as a basis for a *Monell* liability claim against the City.  To state a *Monell* claim based on a failure to supervise, a plaintiff must allege "(1) . . . a pattern of allegations of or complaints about, or a pattern of actual, similar unconstitutional activity, and (2) the municipality consistently failed to investigate those allegations."  *Treadwell v. Cnty. of Putnam*, 2016 WL 1268279, at *4 (S.D.N.Y. Mar. 30, 2016).  Failure to supervise supports *Monell* liability when the failure is "tantamount to deliberate indifference."  *Alwan v. City of N.Y.*, 311 F. Supp. 3d 570, 578 (E.D.N.Y. 2018).  A plaintiff proves deliberate indifference when "the need for more or better supervision to protect against constitutional violations was obvious."  *Vann v. City of N.Y.*, 72 F.3d 1040, 1049 (2d Cir. 1995).  Construed liberally, Plaintiff's allegations that he contacted the City's 311 services numerous times to complain about the lack of adequate meal provision are nearly sufficient to establish a failure to supervise correctional officers on the City's part.  Plaintiff noted and alleged that those receiving his 311 complaints did not take action, which construed liberally, amounts to deliberate indifference.  Dkt. No. 25 at 16.  However, Plaintiff's allegations lack specificity and

explicit references to a failure to supervise.  Namely, Plaintiff "must at least allege that the need for more or better supervision was obvious, that the failures in supervision were so likely to result in the alleged deprivations so as to as to constitute deliberate indifference, and that there is a causal relationship between those failures and his injuries."  *Lehal v. Central Falls Detention Facility Corp.*, 2016 WL 7377238, at *12 (S.D.N.Y. Nov. 21, 2016) (cleaned up).  Without greater detail regarding the City's failure to supervise correctional officers as well as the causal link between that failure and the injury to Plaintiff, namely his malnourishment, the amended complaint fails to state a *Monell* claim.  Ultimately, the Court concludes that Plaintiff has failed to successfully allege a *Monell* claim against the City.

The Court nonetheless declines to dismiss the *Monell* claim with prejudice.  "Dismissal with prejudice is appropriate when the flaws in pleading are incurable."  *Kling v. World Health Org.*, 532 F. Supp. 3d 141, 154 (S.D.N.Y. 2021) (internal quotation marks omitted).  However, "[a] *pro se* complaint is to be read liberally.  Certainly the court should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated."  *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (quoting *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 795 (2d Cir. 1999)).  Here, as previously noted, Plaintiff alleged that he called the "311" telephone number nine times.  Dkt. No. 52 at 9.  He also has four confirmation numbers related to those events.  *Id*.  He alleges that the municipality never sent an inspector and that the situation never improved.  *Id*.  The Court cannot rule out the possibility that Plaintiff's injuries were causally related to a failure to supervise on this record and that policymakers were "knowingly and deliberately indifferent" to the possibility that officers would fail to remediate food inadequacies at Rikers Island and otherwise made "no meaningful attempt" to curb this conduct.  *Amnesty Am. v. Town of W.*

26

*Hartford*, 361 F.3d 113, 127 (2d Cir. 2004).  For these reasons, the Court dismisses the *Monell*

claim without prejudice to renewal if Plaintiff chooses to replead that claim and can do so with

further facts establishing the basis for a claim.


## CONCLUSION

For the reasons stated above, Defendants' motion to dismiss is GRANTED in part and

DENIED in part.  Plaintiff's claim of *Monell* liability against the City is dismissed without

prejudice.

The Clerk of Court is respectfully directed to close Dkt. No. 33.


SO ORDERED.

Dated: September 19, 2022
       New York, New York          _____
                                        LEWIS J. LIMAN
                                   United States District Judge